**RECORD NO. 15-4066(L)**
**CONSOLIDATED W/ NO. 15-4079**

IN THE

# United States Court of Appeals

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

NAEEM DEONTE JONES and
DEMONTE DENZEL MEADOWS,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

**CONSOLIDATED OPENING BRIEF OF APPELLANTS**

James B. Craven III*
ATTORNEY AT LAW
Post Office Box 1366
Durham, NC 27702
(919) 688-8295
jbc64@mindspring.com

*Lead Counsel and
Counsel for Appellant
Naeem Deonte Jones*

H.A. Carpenter IV
ATTORNEY AT LAW
100 South Elm Street, Suite
430
Greensboro, NC 27401
(336) 333-5255
carpenterlawoffices@gmail.com

*Counsel for Appellant
Demonte Denzel Meadows*

## TABLE OF CONTENTS

Page

Table of Cases and Authorities----------------------------i

Statement of Jurisdiction--------------------------------1

Issues--------------------------------------------------1

Statement of the Case-----------------------------------1

Statement of the Facts----------------------------------2

Summary of the Argument---------------------------------2

Standard of Review--------------------------------------3

Argument------------------------------------------------3

Conclusion----------------------------------------------20

Request for Oral Argument-------------------------------21

Certificate of Compliance with Typeface and
    Length Limitation-----------------------------------22

Certificate of Service----------------------------------23

## TABLE OF CASES AND AUTHORITIES

Page

**CASES**

McKeiver v. Pennsylvania, 403 U.S. 528 91 S.Ct.
        1976, 29, L.Ed.2d 648 (197)-------------------------13

Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183,
161 L.Ed.2d 1 (2005)---------------------------------------15

Rosenberg v. United States, 346 U.S. 273, 73S.Ct.1152,
        97 L.Ed. 1607 (1953)--------------------------------12

State ex rel. Simmons v. Roper, 112 S.W.3d 397, 399
(Missouri 2003)----------------------------------------------19

United States v. Booten, 914 F.2d 1352
        (9th Cir. 1990)--------------------------------------12

United States v. Carter, 410 F.3d 942, 954
        (7th Cir. 2005) ---------------------------------------- 9

United States v. Coates, 113 F. App'x 520
        (4th Cir 2004)-----------------------------------------6

United States v. Doubet, 969 F.2d 341, 346
        (7th Cir. 1992)---------------------------------------- 9

United States v. Eubanks, 593 F.3d 645
        (7th Cir. 2010)----------------------------------8, 10

United States v. Greene, 740 F.3d 275 (4th Cir. 2014) ------3

United States v. Hawkins, 87 F.722
        (5th Cir. 1996)---------------------------------------6

United States v. Johnson, 28 F.3d 151
        (D.C. Cir. 1994)--------------------------------13, 15

United States v. Kills in Water, 293 F.3d 432, 437
        (8th Cir. 2002)---------------------------------------6

United States v. Nelson, 740 F.Supp.1502
        (D. Kansas 1990)--------------------------------------12

<u>United States v. Osborne</u>, 514 F.3d 377
    (4th Cir. 2008)--------------------------5, 6, 7, 8, 9

**<u>Authorities</u>**

18 U.S.C. 924(c)(1)(A)(ii)----------------------------------1

18 U.S.C. 1951(a)----------------------------------------1

18 U.S.C. 3231-----------------------------------------1

18 U.S.C. 4106-----------------------------------------1

**<u>Federal Sentencing Guidelines</u>**

Section 1B1.1----------------------------------------4

Section 2B3.1(b)(4)(A)-----------------------------2, 4, 8

Section 2B3.1(b)(4)(B)-----------------------------2, 10

Section 4A1.1(c)------------------------------------2

Section 4A1.2(d)(2)(B)------------------------------2

Section 4A1.3(b)(1)---------------------------------3

## STATEMENT OF JURISDICTION

The District Court had jurisdiction over this case by virtue of 18 U.S.C. 3231. This Court has jurisdiction over the appeals by virtue of 18 U.S.C. 4106. Judgments were entered in the District Court on January 30, 2015 and notices of appeal were filed February 2 and February 6, 2015.

## ISSUES

A. WAS IT ERROR FOR THE DISTRICT COURT TO IMPOSE A FOUR-LEVEL ENHANCEMENT FOR ABDUCTION OF A VICTIM ON EACH DEFENDANT, RATHER THAN A TWO-LEVEL ENHANCEMENT FOR RESTRAINT OF A VICTIM?

B. SHOULD JUVENILE ADJUDICATIONS AT AGE 15 BE SCORED FOR CRIMINAL HISTORY CATEGORY PURPOSES? ALTERNATIVELY, DID CATEGORY III FOR JONES SUBSTANTIALLY OVERREPRESENT HIS CRIMINAL HISTORY?

## STATEMENT OF THE CASE

Naeem Deonte Jones and Damonte Denzel Meadows were charged identically in an indictment returned July 1, 2014 (App. p. 10-11). In Count One they were charged with a Hobbs Act robbery in violation of 18 U.S.C. 1951(a), and pointing a firearm at the victims and placing them in restraints, all on May 23, 2014 in Durham, North Carolina. In Count Two they were charged with brandishing firearms during the robbery, in violation of 18 U.S.C. 924 (c)(1)(A)(ii).

1

Pursuant to identical plea agreements (App. p. 12-25), Jones and Meadows entered guilty pleas to both counts on September 8, 2014 (App. p. 31-54). On December 16, 2014 they were sentenced, Jones to 125 months and Meadows to 121 months (App. p. 55-100). Judgments were entered January 30, 2015 (App. p. 101-112). Notice of Appeal for Jones was filed February 2, 2015 (App. p. 113-114) and for Meadows on February 6, 2015 (App. P. 115-116).

## STATEMENT OF THE FACTS

For purposes of this appeal, the Factual Basis filed by the Government on August 29, 2014 (App. p. 26-19), with which Jones and Meadows generally agreed (App. p. 51-53) is an adequate summary of the facts of this case. See also the identical Offense Conduct portions of the presentence reports (App. p. 120-121, 144-146).

## SUMMARY OF THE ARGUMENT

The four-level enhancement for abduction of a victim under Section 2B3.1(b)(4)(A) is unjustified in this case, for both Meadows and Jones, and should be replaced by a two-level enhancement for physical restraint under Section 2B3.1(b)(4)(B).

For Jones alone, the two juvenile adjudications at age 15 should not be scored for Criminal History Category purposes under Section 4A1.1(c) and Section 4A.1.2(d)(2)(B). In the

alternative there should for Jones be a downward departure from Category III to Category II under Section 4A1.3(b)(1), as Category III substantially overrepresents the seriousness of Jones' criminal history or the likelihood that he will commit other crimes.

## STANDARD OF REVIEW

On the abduction enhancement issue, the factual findings are reviewed for clear error and legal conclusions here reviewed de novo. The evidence is construed in the light most favorable to the Government, as the prevailing party in the District Court. See United States v. Greene, 740 F.3d 275 (4th Cir. 2014). On the Criminal History Category issue, peculiar to Jones, the standard of review is plain error, as the issue was not raised in the District Court.

## ARGUMENT

A.  The crux of this case is addressed in the sentencing memorandum filed November 7, 2014 on behalf of Meadows (App. p. 158-164). Although filed for Meadows alone, the District Court at sentencing advised the parties that it would apply to both Meadows and Jones (App. p. 57).

The store in Durham that was robbed contains two rooms, a front room for the public, where the merchandise and cash register are located, and a back room for storage and supplies,

3

separated by a locked door. The three robbers (Jones, Meadows, and a juvenile not a party to this case) came in the store, masked and armed, demanding of the store owner and an employee wallets, keys, and cell phones, which were given up. They then instructed the two to leave the front room or sales floor and go into the back room, where they were bound hand and foot with duct tape (App. p. 61-63). When the Durham Police arrived at the front door, the robbers ran into a back bathroom (App. p. 64). The door to the back room is perhaps 20 feet from the cash register (App. p. 65).

In their presentence reports, both Jones and Meadows were enhanced four offense levels under Section 2B3.1(b)(4)(A), Federal Sentencing Guidelines, "because a person was abducted to facilitate the commission of the offense." (App. p. 123-147). "Abducted" is defined, for Guideline purposes, in Application Note 1 of the Commentary to Section 1B1.1, as follows:

> "Abducted" means a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction."

Some abduction situations make for easy applications of the enhancement, for example the one referenced by the Sentencing Commission, the bank teller forced out of the bank and into the

4

getaway car.  Others are not so simple, and several of those were argued at sentencing in this case (App. p. 69-76).

Sean Osborne robbed a Walgreens drug store in Bristol, Virginia in 2005.  The drug store, like most such stores today, was one very large room, with a cash register counter and photo area up front, and then aisles of merchandise, and finally the pharmacy section in the back.  The very back of the pharmacy section was for pharmacy employees only, i.e. customers were not allowed behind the pharmacy counter.  Osborne got one of the pharmacists to leave the locked pharmacy area by asking her for help in locating an over the counter medication for an earache.  As soon as she came out into the public area, he showed her a knife and asked for narcotic drugs.  She reentered the pharmacy area, followed by Osborne, got the Oxycodone and Valium for him and was then instructed to "walk me out." The two pharmacists complied, walking Osborne through the store to the front door, because they were scared and he had a knife.  He told them to come outside with him, but they declined.

In United States v. Osborne, 514 F.3d 377 (4th Cir. 2008) this court affirmed the District Court enhancement for abduction.  Osborne conceded he forced the pharmacists to accompany him but disputed that they were forced to accompany him to a different location, within the context and meaning of Application Note 1(A) referenced above.  An analogy was drawn to

forcing a bank teller into a bank vault.  The Court also drew on United States v. Coates, 113 F. App'x 520 (4th Cir 2004). There, Coates forced a young girl from the toy department to the lawn and garden department, and then to the men's clothing department of a Target store in West Virginia, all for the purpose of sexually assaulting her.  Coates' argument against the abduction enhancement as of course that he and the girl at all times remained inside the Target store and that he only shifted her from one area to another within the same general location.  This Court however held that for the abduction enhancement to apply "the victim need not have been moved any great distance," Coates at 522.  And following Coates, this Court in Osborne held that the abduction enhancement "may properly be applied even though the victim remained within the confines of a single building." See also United States v. Hawkins, 87 F.722 (5th Cir. 1996) where the victims were moved at gunpoint 40-60 feet within the same parking area, and United States v. Kills in Water, 293 F.3d 432, 437 (8th Cir. 2002).

The case at hand is different in significant ways from Osborne.  The pharmacy victims in Osborne were essentially taken hostage to facilitate the defendant's escape out of the front door, which was the type of conduct targeted by the abduction enhancement.  514 F.3d at 390.  This was hardly the case here. And too, the store robbed in this case, the Soletez Boutique in

6

Durham, was significantly smaller than the Walgreens in Osborne. The movement of the store employees in this case from the front area to a back room, while in fact movement between rooms, was nowhere near as aggravated as the movement is Osborne. The victims in Osborne were removed from the relatively secured safety of the pharmacy section through the aisles of the store and out to the front door. They were used as human shields during Osborne's attempt to escape the store. The movement of the victims in Osborne put those victims in imminent danger if law enforcement arrived and attempted to stop the defendant. After completing the robbery, Osborne intentionally placed the victims in harm's way as he attempted to escape from the store. The aggravated nature of the movement in Osborne and the added exposure of the victims during their movement, justified the abduction enhancement in that case.

The movement of the victims in the present case is different. The victims at the Soletez Boutique were moved from the front of the store to the back room and were then restrained with duct tape. The movement was from one section of a store to the back room within the same small building. Unlike in Osborne, those victims were not intentionally placed in harm's way. No secured access was deliberately breached in the present case. No victims were used as human shields as the victims were used in Osborne. In the back room in the present case, the

defendants started to look for shoes, and at the first sign of police, the young defendants hid in a bathroom.

The facts of the movement of the victims in this case do not rise to the same level of aggravation of those that took place in Osborne. That movement in the present case is not movement "to a different location" to which the abduction enhancement was meant to apply. The movement from the front of the store to the back room in this case contained no additional aggravating circumstances beyond the nature of the robbery itself. It was not movement "to a different location" but was simply movement within the small Soletez Boutique. No secured access was breached. No victims were intentionally used as human shields during an escape.

The circumstances and facts of this case simply do not justify an enhancement under Section 2B3.1(b)(4)(A).

The Seventh Circuit addressed this issue, and Osborne, in United States v. Eubanks, 593 F.3d 645 (7th Cir. 2010). There an employee was forced at gunpoint during the robbery of a beauty supply store in Illinois to go from the main store area into a back room to retrieve surveillance video, 593 F.3d at 648. The District Court had relied on Osborne for the abduction enhancement in against Eubanks, but the Seventh Circuit found significant differences, noting that:

The facts here are significantly different from _Osborne_. In _Osborne_, the defendant forced store employees from an independent section of the store, which was separated by a secured door and only accessible by authorized persons via keypad, through the entire building and out to the front door. More importantly, the victims in _Osborne_ were essentially taken hostage to facilitate the defendant's escape-which is the type of conduct "plainly targeted by the abduction enhancement." _Osborne_, 514 F.3d at 390. But . . . a co-defendant forced a store employee to the back room of a retail beauty supply store to retrieve a surveillance video. And…the victim was moved no more than six feet. Thus, the distance and nature of the confinements in this case were materially different than in _Osborne_.

We think that this case is indistinguishable from cases such as _Carter_ and _Doubet_[1]. Under these facts, and taking into account the physical dimensions of the structures at issue, transporting the victims from one room to another

---

[1] _United States v. Carter_, 410 F.3d 942, 954 (7th Cir. 2005) and _United States v. Doubet_, 969 F.2d 341, 346 (7th Cir. 1992).

is simply not enough for abduction. To find otherwise would virtually ensure that any movement of a victim from one room to another within the same building, without any other aggravating circumstances, would result in an abduction enhancement. While there may well be situations in which an abduction enhancement is proper even though the victim remained within a single building, those facts are not present here.

In Eubanks the Court held it was error to apply the four level enhancement for abduction, but that Eubanks should be enhanced two levels for restraint under Section 2B3.1(b)(4)(B). We concede that in the case at hand a two level enhancement for restraint would be perfectly appropriate, as the victims were bound with duct tape.

Meadows was, with the abduction enhancement, at Total Offense Level 21 and Criminal history Category I, for an applicable advisory Guideline range of 37-46 months for the Hobbs Act robbery, with a mandatory 7 years (84 months) consecutive for the firearm offense. Thus Meadows faced a total Guideline range of 121-130 months, and was sentenced at the low end of 121 months (App. p. 153). If the abduction enhancement were replaced by the restraint enhancement, Meadows would be at

10

19/I for an advisory range of 30-37 months, plus 84 months consecutive, or a total range of 114-121 months. A low end sentence for him would thus be 114 months.

Similarly, replacing the abduction enhancement with the restraint enhancement would move Jones from 21/III and a range of 46-57 months for the Hobbs Act count plus 84 months consecutive, or a total range of 130-141 months to 19/III and a range of 37-46 months plus 84 months consecutive, for a total range of 121-130 months (App. p. 130). He was sentenced to 125 months, or just over 96% of the low end of 130 months. A sentence of 96% of the low end of the 121 months for Jones would be 116 months.

The judgments in both cases should be vacated and the cases remanded for resentencing, with the two-level restraint enhancement substituted for the four-level abduction enhancement.

*B.*   Jones and Meadows were not far past their 18th birthdays when the robbery was committed. Meadows was, not surprisingly, in Criminal History Category I (App. P. 149). Jones though was in Criminal History Category III, in part because of the inclusion of the two cases in which he was "adjudicated delinquent" at age 15 (App. P. 123-124). No objection was made at sentencing, so we concede the standard of review on

this issue is plain error. We believe that standard can be met though, and that Jones should have had only 4 criminal history points, not 6. While either is sufficient for Category III, it is clear that for Jones, Category III over represents his criminal past.

Juvenile adjudications, not to say convictions, have long been held scoreable under the Guidelines, we believe mistakenly so, but it is too late to fight that battle. See for example United States v. Booten, 914 F.2d 1352 (9th Cir. 1990). There is hope though for Naeem Jones. In United States v. Nelson, 740 F.Supp.1502 (D. Kansas 1990), the District Court lowered one defendant's criminal history category from III to II as the offense was his first adult conviction. The Court "also considered the youthful age at which Nelson committed the prior offenses," 740 F.Supp. at 1519. In this case Jones' juvenile adjudications were for offenses committed at age 15 (App. P. 123-124).

Dissenting opinions are important, and have a purpose. Justice Frankfurter expressed it well, if chillingly, in his dissent in Rosenberg v. United States, 346 U.S. 273, 73 S.Ct.1152, 97 L.Ed. 1607 (1953):

To be writing an opinion in a case affecting two lives after the curtain has been rung down upon them has the appearance of pathetic futility.

12

But history also has its claims.  This case is an incident in the long and unending effort to develop and enforce justice according to law.  The progress in that struggle surely depends on searching analysis of the past, though the past cannot be recalled, as illumination for the future.  Only by sturdy self-examination and self-criticism can the necessary habits for detached and wise judgment be established and fortified so as to become effective when the judicial process is again subjected to stress and strain.

In that spirit we believe that it is patently wrong to hold young people forever accountable for acts of juvenile delinquency, though we acknowledge that the case law is against us.  We take heart though from the dissenting opinion of Judge Patricia Wald in <u>United States v. Johnson</u>, 28 F.3d 151 (D.C. Cir. 1994).  She notes for example, interestingly, that the Supreme Court in <u>McKeiver v.  Pennsylvania</u>, 403 U.S. 528 91 S.Ct. 1976, 29 L.Ed.2d 648 (197) held that a juvenile delinquency proceeding was not a "criminal prosecution" within the context and meaning of the Sixth Amendment, and as such did not require a jury trial, 403 U.S. at 550-551, 91 S.Ct. at 2052. Judge Wald went on to note that:

Juvenile dispositions are made by a judge, rather than a jury. Juvenile confinement, unlike adult incarceration, is still largely imposed on the basis of characteristics of the offender, rather than the characteristics of the offense. The imposition and duration of juvenile confinement may be set irrespective of the sentence ranges for adult offenders. It is therefore not instructive of criminal history at all, in the substantial majority of the states and the District of Columbia, to reveal that the defendant, as a juvenile, spent six days or more in juvenile confinement. It may simply mean that the juvenile lacked an adequate home or that the community lacked adequate services. Even in the minority of states adhering to an expressly punitive model of juvenile confinement, juvenile sentences are inherently a less reliable indication of criminal disposition than periods of adult imprisonment given the untrammeled discretion of the sentencer and the absence of a jury trial.

In light of these differences, I believe the Sentencing Commission strayed beyond permissible boundaries of interpretation in treating juvenile sentences and periods of confinement like adult sentences and periods of incarceration for purposes of automatic increase to the defendant's criminal history category.  28 F.3d at 160. And that:

> In the District (as in two-thirds of all other states), juvenile sentencing is still offender-specific and cannot, therefore, serve as a proxy for past culpability or future dangerousness. Because the district court extended his sentence twenty months by applying a guidance automatically treating juvenile and adult sentences alike, I believe that Johnson is entitled to challenge that guideline and that it should be struck like any other irrational regulation on conventional *Chevron* grounds.

Christopher Simmons was not 15, but 17, when he committed an unusually heinous murder in Missouri.  He was tried as an adult, convicted and sentenced to death.  In Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Supreme Court held that the Eighth and Fourteenth Amendments to the Constitution forbid imposition

of the death penalty on offenders who were under age 18 when their crimes were committed.  Justice Kennedy, for the court majority, noted that:

> Three general differences between juveniles under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders.  First, as any parent knows and as the scientific and sociological studies respondent and his amici cite tend to confirm, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions."  Even the normal 16-year-old customarily lacks the maturity of an adult.  It has been noted that "adolescents are overrepresented statistically in virtually every category of reckless behavior."  In recognition of the comparative immaturity and irresponsibility of juveniles, almost every State prohibits those under 18 years of age from voting, serving on juries, or marrying without parental consent.

The second area of difference is that juveniles are more vulnerable or susceptible to negative influences and outside pressures including peer pressure. [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be more susceptible to influence and to psychological damage. This is explained in part by the prevailing circumstances the juveniles have less control, or less experience with control, over their own environment. ("[A]s legal minors [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting.")

The third broad difference is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed.

These differences render suspect any conclusion that a juvenile falls among the worst offenders. The susceptibility of juveniles to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." Thompson, supra, at 835 (plurality opinion). Their own vulnerability and comparative lack of control over their immediate surroundings means juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is

evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a great possibility exists that a minor's character deficiencies will be reformed. Indeed, "[t]he relevance of youth as a mitigating factor derives from the fact that the signature qualifies of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." ("For most teens, [risky or antisocial] behaviors are fleeting; they cease with maturity as individual identity becomes settled. Only a relatively small proportion of adolescents who experiment in risky or illegal activities develop entrenched patterns of problem behavior that persists into adulthood.") (Citations omitted).

Justice Kennedy noted too that:

> It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption. As we understand it, this difficulty underlies the rule forbidding psychiatrists from diagnosing any patient under 18 as having antisocial personality disorder, a disorder also referred to as

18

psychopathy or sociopathy, and which is characterized by callousness, cynicism, and contempt for the feelings, rights and suffering of others. If trained psychiatrists with the advantage of clinical testing and observation refrain, despite diagnostic expertise, from assessing any juvenile under 18 as having antisocial personality disorder, we conclude that States should refrain from asking jurors to issue a far graver condemnation - - that a juvenile offender merits the death penalty. (Citations omitted).

And yet we hold Naeem Jones fully accountable for two juvenile delinquency adjudications at age 15 as though he had been an adult for all purposes then. The Missouri Supreme Court in State ex rel. Simmons v. Roper, 112 S.W.3d 397, 399 (Missouri 2003) held that "a national consensus has developed against the execution of juvenile offenders." Is there no similar consensus against treating a 15-year-old as though he were a fully responsible grown man? We recognize that these issues continue to evolve. Just for example, USA Today on April 6, 2015 reported that "Juvenile defendants will no longer routinely be shackled during appearances in the District of Columbia's federally run court system," arguably progress of a sort.

19

It would be fair, reasonable, and frankly sensible to discount, i.e. not score for Guideline purposes, Jones' two juvenile adjudications at age 15. Failing that Criminal History Category II fits Jones much better than Category III. If we prevail on the first issue, that of the abduction enhancement, and on this issue, Jones would be at Total offense Level 19 and Criminal History Category II, or an applicable advisory range on the Hobbs Act robbery count of 33-41 months, with 84 months consecutive on the firearm count, for a total range of 117-125 months.

**CONCLUSION**

For all the reasons set forth above, and in the interest of justice, the judgments in these cases should be reversed as to the Hobbs Act robbery charge in Count One of the July 1, 2014 indictment (App. p. 10-11) and the cases remanded to the District Court for resentencing.

Respectfully submitted,

/s/ James B. Craven III
Attorney for the Appellant Jones
Lead Counsel for the Appellants
P.O. Box 1366
Durham, NC 27702
919-688-8295
NCSB No. 997
jbc64@mindspring.com

/s/ H.A. Carpenter IV
H.A. Carpenter IV
Attorney for the Appellant Meadows
100 South Elm Street, Sutie 430
Greensboro, NC 27401

(336) 333-5255
carpenterlawoffices@gmail.com

## REQUEST FOR ORAL ARGUMENT

Were these cases in the Sixth Circuit or the Seventh Circuit, perhaps others as well, they would as a matter of routine be calendared for oral argument. They deserve no less here. As Jones and Meadows, now 19, are incarcerated until likely 2023, much is at stake, for them and for the Government.

21

## CERTIFICATE OF COMPLIANCE WITH TYPEFACE AND LENGTH LIMITATIONS

The undersigned counsel hereby certifies that this brief complies with Fed. R. App. 28.1(e)(2) and Fed. R. App. P 32(a)(5)(B).

This brief has been prepared in Microsoft Word, Courier New, Font 12, and contains 21 pages (496 lines).

This 16th day of April 2015.


/s/ James B. Craven III
James B. Craven III

## CERTIFICATE OF SERVICE

I have this day caused to be filed with the Clerk, United States Court of Appeals for the Fourth Circuit, the foregoing Opening Brief of Appellants via hand delivery and electronically using the Court's CM/ECF system which will send notification of such filing to counsel below:

Kyle D. Pousson, Esquire
Special Assistant United States Attorney
101 South Edgeworth Street, Fourth Floor
Greensboro, NC  27401

This 16th day of April 2015.


/s/ James B. Craven III
James B. Craven III